**FISH et al. v. KENNAMER, District Judge.**

**HOSEY et al. v. SAME.**

Circuit Court of Appeals, Tenth Circuit.
December 23, 1929.

Nos. 160, 161.

244

Charles West, of Tulsa, Okl., for petitioners Fish and others.

J. M. Springer, J. W. Simpson, E. G. Wilson, Joseph A. Gill, and George W. Reed, Jr., all of Tulsa, Okl., for petitioners Hosey and others.

N. A. Gibson and Charles B. Selby, Sp. Asst. to Atty. Gen., for respondent.

Before LEWIS, COTTERAL, and PHILLIPS, Circuit Judges.

LEWIS, Circuit Judge. These are applications for writs of mandamus to compel the District Judge to make certain orders in a cause pending before him. The litigation in which the orders are sought is over an allotment of 160 acres of land in Creek county, Oklahoma, to Ullie Eagle, a full-blood Creek Indian who died intestate and without issue in June, 1902. In 1923 Harriett Hosey, with several other Indians who joined her as plaintiffs, brought an action of ejectment in the State district court of Creek county for said 160 acres and for the rents, royalties and profits taken from said land by the named defendants and for damages, all in the sum of $25,000,000. They alleged that Ullie Eagle died intestate and without issue, leaving surviving her no father, mother, sister or brother but left as her sole and only heir-at-law one Patience DePriest, who is enrolled as a Creek citizen, that said Patience DePriest was the daughter of one Jane Strickland, Jane Strickland was the sister of one Sealie, Sealie was the mother of one Tochee, and Tochee was the mother of Ullie Eagle; that said Tochee, mother, and Sealie, grandmother, of Ullie, and Jane Strickland, sister of Sealie, all died prior to the death of Ullie Eagle, and said Patience DePriest was the next of kin

and sole heir of said Ullie Eagle, and that said Patience DePriest died in September, 1904, and left as her sole surviving heirs-at-law the plaintiff Harriett Hosey and her co-plaintiffs. Several oil companies and several individuals were made defendants, who it appears claimed title, or some interest, as owners or lessees, mediately or immediately, under conveyance made by Nellie Fish, who, they claim, was the nearest relation to Ullie Eagle at the time of her death, within the meaning of the Creek law of descent and distribution, and was her sole surviving heir. Soon after this suit was instituted several other Indians, known as the Guthrie group, were permitted to intervene as plaintiffs, they also claiming to be heirs of Ullie Eagle. Harriett Hosey and her co-plaintiffs admitted the claim of the Guthrie group. Then the Malone group, who claimed to be heirs were admitted. Then the Monahwee group of claimants were permitted to intervene. The two last-named groups claimed heirship through a different ascending-descending line from the original plaintiffs and the Guthrie group. No objection was made to the intervention of said three groups. The two last-named groups joined issue with the original plaintiffs and set up their own claims as sole heirs. After answers were filed the case went to trial before a jury in the State court and the plaintiffs had a verdict. A motion for new trial was sustained. Thereupon other groups of Indian claimants asserting to be heirs of Ullie Eagle were admitted as parties, some while the action was pending in the State court and some after it was removed to the Federal court, in the manner hereinafter stated, until there were in all some nineteen different groups of Indians, consisting of about two hundred persons in all, and all claiming to be collateral kindred. These interveners joined issue between themselves as to heirship and with the original plaintiffs. The case was removed to the Federal court pursuant to Act of April 12, 1926 (44 Stat. 239). After removal the Federal court permitted some of the groups referred to above to intervene as parties under claims of heirship. Some of the defendants filed cross-bills and joined therein a number of Indians who had not intervened but who, the cross-bills alleged, were asserting claims to the allotment. Under the State practice the privilege of intervention is broad, permitting, it seems, every one who claims an interest in the subject-matter involved to come into a case, and apparently no serious objection was raised to that procedure until removal to the Federal court. The plaintiffs and some of

the other groups moved that the cause be remanded to the State court, and that being overruled, the original plaintiffs and some of the interveners moved that all equitable defenses and cross-bills be stricken out, that interventions of different groups which had been permitted by the Federal court be also vacated, and repeated attacks of that kind were made throughout the progress of the case in the Federal court. The gravamen of the insistence here by these petitioners for the writ is based on the contention that the action of the original plaintiffs and the Guthrie group who joined with them as plaintiffs, was in ejectment, a plain and simple action at law, in which they were entitled to trial by jury without interference from all others who were claiming adversely to them. The court below denied all of these contentions and over opposition of petitioners here transferred the equity issues in the cause to the equity docket and appointed a master to take the proof and report his findings of fact and conclusions of law. Among other exhibits showing the course of procedure counsel have submitted to us the report of the master, who found as a fact "that at the time of the death of Ullie Eagle on June 8, 1902, she left surviving her as her nearest relation Nellie Fish, her aunt." He further found that none of the intervening groups nor the original plaintiffs had sustained their claims to heirship.

There is really but one issue of fact in the case, and that is, as to who was or were the heirs of Ullie Eagle; the other issues are subsidiary, involving only an accounting and an order of possession if the original plaintiffs or any of the interveners should succeed in their contentions. But it is vigorously and ably contended that the original plaintiffs have been denied a guaranteed right, trial by jury; that they had a right to conduct their case to its conclusion without interference from other intervening claimants; that the right of other claimants, adverse to plaintiffs, the Hosey and Guthrie groups, was not by intervention but by original action, and that each set of claimants must pursue that course in support of their contentions that they are the heirs of said deceased; that defendants were not entitled, under the equity rules and the construction given to them, to interpose equitable defenses and file in plaintiffs' law action so-called cross-petitions for equitable relief, that the action of the court below in permitting this, in transferring said equity issues to the equity docket, and in referring those issues to a master should all be vacated and set aside and the district judge

directed by this court through its writ to make the necessary orders for that purpose, that he sustain the original plaintiffs' motions to strike out the interventions and give said plaintiffs a trial by jury in their law action.

We are disposed to think that in an ordinary case, and in the usual circumstances that confront a court, these contentions are sound; but that the unusual and exceptional circumstances with which the court below was confronted, the Act of Congress of April 12, 1926, the civil status of the original plaintiffs and interveners, the large number asserting heirship, and the consequences to the defendants in the course contended for, authorized the court below to pursue the course it adopted in disposing of the controversy. It fairly appears that a very large number, if not all, of those claiming to be heirs of Ullie Eagle, are under the protecting guardianship of the United States, and the latter deemed it necessary in their interest and in the orderly determination of their claimed rights to come into this litigation and remove the case into a court of the United States, and its counsel appear to have participated in the procedure since and in the hearings before the master. When their guardian intervened they were no longer free to conduct their litigation, as does an ordinary litigant, and the guardian has raised no objection to the course pursued by the district judge. The basis for the removal of the suit from the State to the Federal court is set forth in section 3 of the Act approved April 12, 1926 (44 Stat. 240) thus:

"Any one or more of the parties to a suit in the United States courts in the State of Oklahoma or in the State courts of Oklahoma to which a restricted member of the Five Civilized Tribes in Oklahoma, or the restricted heirs or grantees of such Indian are parties, as plaintiff, defendant, or intervenor, and claiming or entitled to claim title to or an interest in lands allotted to a citizen of the Five Civilized Tribes or the proceeds, issues, rents, and profits derived from the same, may serve written notice of the pendency of such suit upon the Superintendent for the Five Civilized Tribes, and the United States may appear in said cause within twenty days thereafter, or within such extended time as the trial court in its discretion may permit, and after such appearance or the expiration of said twenty days or any extension thereof the proceedings and judgment in said cause shall bind the United States and the parties thereto to the same extent as though no Indian land or question were involved."

So far as the section has been quoted its evident purpose is to give the United States an opportunity to intervene in said cause so that the judgment therein may bind it and thus cut off a right of the guardian to renew the suit in its name in event the judgment be adverse to the Indian or Indians. The section then proceeds to state that the notice shall be served on the Superintendent by the United States Marshal; that a copy of it shall be filed with the clerk of the court in which the action is pending, accompanied by a certified copy of all the pleadings on file in the suit, and that "in no event shall the United States be bound unless written notice is had as herein specified: Provided, that within twenty days after the service of such notice on the Superintendent for the Five Civilized Tribes, or within such extended time as the trial court in its discretion may permit, the United States may be, and hereby is, given the right to remove any such suit pending in a State court to the United States District Court by filing in such suit in the State court a petition for the removal of such suit into the United States District Court, to be held in the district where such suit is pending." The Superintendent having been served with the notice, the United States did not elect to stand out, as it might have done under the statute, let the case take its course in the State court and thus be bound by the final judgment therein; but it chose to come in and remove the suit to the Federal court. The section then proceeds:

"It shall then be the duty of the State court to accept such petition [for removal] and proceed no further in said suit * * * and the cause shall then proceed in the same manner as if it had been originally commenced in said district court, and such court is hereby given jurisdiction to hear and determine said suit, and its judgment may be reviewed by certiorari, appeal, or writ of error in like manner as if the suit had been originally brought in said district court."

 It is true the statute does not expressly say that the United States is a party to the cause on its removal to the Federal court; but we see no reason why, considering the purpose of the statute and the intervention of the United States for removal, which was undoubtedly the exercise of its protecting care over the Indians' rights, it should not thereafter participate in the disposal of the whole controversy in its capacity as guardian, and, as said, it was represented by counsel thereafter in the cause. The master reported to the court that in the proceedings before him "Charles B. Selby and Lewis N. Stivers

represented the United States of America." The procedure complained of seems to have been taken with the participation and consent of the guardian. No one can doubt the difficulty involved in a determination of heirship under the facts that have been stated, and that the issue would have been one almost impossible of right solution by a jury. The report of the master, which is only a summary of the proof on that point, demonstrates the truth of this statement. He took the testimony of 235 witnesses.

 Moreover, it is a general principle that equity will take jurisdiction on the sole ground of preventing a multiplicity of suits, and in such a case an objection that there has been a misjoinder of parties will not be sustained. Louisville & N. R. Co. v. Smith et al. (C. C. A.) 128 F. 1. Some of the defendants in their cross-bills plead title and possession, that the original plaintiffs to the action, all of the intervening claimants, and other Indians whom they made defendants, were asserting some right or claim to the allotment, that in fact they had no lawful claim or right thereto and they asked that their title be quieted. This cross-bill, when the case reached the Federal court, was transferred to the equity docket and thus treated as an independent suit. The equitable issues thus presented were ordered to be first tried before any action should be taken in disposition of the law issues, and these were the issues referred to and passed upon by the master, to which the original plaintiffs and other intervening claimants now seriously object. We think the trial court did not err. The opinion of Judge Brewer in Hyman v. Wheeler et al. (C. C.) 33 F. 629, 630, is to the point. There the plaintiff filed a bill in equity to protect his property rights in a vein of mineral to which the several defendants named claimed title to different parts. The learned judge said:

"It is claimed by counsel that there is no unity of interest on the part of the various defendants; that because one man has a claim to one piece of ground, and from that asserts title to a portion of this vein, his controversy with the plaintiff is entirely independent and distinct from the controversy with another man, who has another piece of ground, and upon his claim to that ground asserts a right to perhaps a distinct portion of this vein. Very many authorities were presented and discussed. I think it impossible to harmonize them all, and therefore do not stop to comment upon them. The case of [Central Pac.] Railroad Co. v. Dyer, 1 Sawy. 641 [Fed. Cas. No. 2552], contains what to my mind is very wholesome and salutary doc-

trine in respect to these matters. It lays down the proposition that where there is a single title to a continuous property, and that title rests upon one state of facts, one grant; and there are many persons who, with inferior titles or claims, are threatening litigation, although their claims may spring from different sources—a court of equity has power, in order to give to the holder of this single property the full enjoyment of his property, to summon all such parties into a single suit, and in that by decree establish the plaintiff's title, and restrain all the defendants from further litigation or interference. It is the only way ofttimes where a man can be protected in the beneficial enjoyment of his property. If each individual claimant—as, in that case, a number of squatters along the line of a railroad—were permitted to maintain his independent action against the railroad company, the cost and the time and the worry of the litigation would seriously impair the value of the grant to the company; and so, according to the statements that are made here, with a knowledge of the expensiveness of this mining litigation and the length to which it may be continued, it may well be, as the complainant asserts, that if every claimant is permitted to carry on his separate action of ejectment, with the two and possibly three trials which the law gives therein, the value of the property, which the government has granted him, will be practically destroyed. I think, therefore, that following that decision, it cannot be said that the fact that these defendants have various interests prevents a court of equity from calling them in. Neither can it be said that there is no equity in the bill. Equity discountenances a multiplicity of suits—that is one of the grounds of its jurisdiction; and it aims, by restraining a multiplicity of suits, to give to the owner of the property the beneficial enjoyment of it, and to enable him to get the benefit of its ownership, rather than waste it in many and diverse suits."

It would be a travesty on justice to say that equity is powerless to protect one in possession of lands purchased in good faith against nineteen sets of claimants of the title, but that he must stand by and wait until each set sues him in turn and take the chances of contradictory verdicts of juries on facts which, under the obvious circumstances of this case, are difficult of correct ascertainment in such trials. Mr. Justice Harlan, while presiding on the circuit, said this in Sheldon et al. v. Keokuk Northern Line Packet Co. et al. (C. C.) 8 F. 769, 770:

"It has been held, by the supreme court of the United States, to be impracticable to lay down any fixed, unbending rule as to what constitutes multifariousness or misjoinder of causes of action. Oliver v. Piatt, 3 How. 411 [11 L. Ed. 622]; Gaines v. Chew, 2 How. 619 [11 L. Ed. 402]; Barney v. Latham [103 U. S. 205, 26 L. Ed. 514], October term, 1880–1. The court must necessarily exercise a large, though, of course, a sound discretion in allowing the union in the same suit of matters which do not alike or equally affect all the parties. Each case must depend upon its special circumstances, and the necessities which may arise out of the due administration of justice in that case. As a general rule, the court will not compel parties to incur the expense, vexation, and delay of several suits, where the transactions constituting the subject of the litigation, or out of which the litigation arises, are so connected by their circumstances as to render it proper and convenient that they should be examined in the same suit, and full relief given by one comprehensive decree. A different rule would often prove to be both oppressive and mischievous, and could result in no possible benefit to any litigant, whose object was not simply to harass his adversary, but to ascertain what were his just legal rights. As to the general propositions there can be no doubt under the authorities."

The above excerpts from the opinions of Judge Brewer and Mr. Justice Harlan were relied upon by District Judge Brown in Halsey v. Goddard (C. C.) 86 F. 25. Of course, the cases that we have cited were suits in equity and did not present equitable pleas or defenses in law actions, but, as we have already said, when this case reached the Federal court the learned District Judge separated the equitable issues from those at law and transferred them to the equity docket, and in that way treated the defendants' cross-bills as independent equitable suits.

After the master made his report in this case exceptions were filed to it but have not been ruled upon. All of the proof has been taken. It is true it was taken over the objection of the original plaintiffs and intervening claimants, but that is no reason why we should depart from the general rule and use the extraordinary writ as a means for final review, as if the case were here on appeal. We have said enough in that regard for present purposes. Henderson Tire & Rubber Co. v. Reeves (C. C. A.) 14 F.(2d) 903.

For the reasons stated the writ will be denied in both of these applications. It is so ordered.